### LORENZO IRWIN VS. ELIZA JANE IRWIN.

1. By the act of congress ratifying § 7, chap. 70, laws of Oklahoma, the probate courts were vested with jurisdiction to hear and determine actions for divorce.

2. A complaint in divorce proceedings which alleges "that on or about February, 1892, and on divers other occasions prior and subsequent thereto, defendant was guilty of cruel and inhuman treatment to the plaintiff, in this, to-wit: slapped said plaintiff; that for a long time past said defendant has cursed and abused said plaintiff by calling her vile names, and that defendant fails, refuses and neglects to provide for the plaintiff and children according to his station in life." *Held* sufficient in the absence of a motion to make more definite and certain.

3. Section 16, chapter 70, Statutes of Oklahoma, provides for issuing an order, without bond, disposing of the property of the parties, pending divorce proceedings.

4. Where the judge of a probate court adjourns the court without fixing, in the order of adjournment, any time to which such court shall reconvene. *Held*, That such an order precludes the court from again convening until the time fixed by law for the next regular session of court.

5. The act of congress ratifying the law of the territorial legislature, granting to probate courts jurisdiction in actions for divorce, was in the nature of permissive legislation and did not take from the legislature the power to repeal such act.

6. The legislature of Oklahoma having repealed the law which gave the probate courts jurisdiction in actions for divorce. *Held*, That such repeal divests probate courts of jurisdiction in such actions.

*Error from Payne County.*

*George P. Uhl*, for appellant.

*W. B. Williams* and *Robt. A. Lowry*, for appellee.

Statement of case and opinion by

DALE, C. J.: January 14, 1893, Eliza Jane Irwin commenced proceedings before the probate judge of Payne county for divorce and alimony. The complaint filed in said cause is as follows:

"In the Probate Court in and for Payne County, Territory of Oklahoma.

"*Eliza Jane Erwin, vs. Elonzo Erwin.*

"That the plaintiff is now, and has been for more than two years last passed, a *bona fide* resident of the Territory of Oklahoma and is now a *bona fide* resident of the county of Payne.

"That the plaintiff and defendant were duly married on the 14th day of March, 1883, and lived together until January 7, 1893; that on or about February —, 1892, and on divers other occasions prior and subsequent thereto, said defendant was guilty of cruel and inhuman treatment to said plaintiff in this to-wit: Slapped said plaintiff.

"Plaintiff further alleges that for a long time past said defendant has cursed and abused said plaintiff by calling said plaintiff vile names. Plaintiff further alleges that said defendant failed, refused and neglected to provide for said plaintiff and her minor children according to his station in life.

"That said plaintiff and defendant have had born to them, as the fruit of their marriage, three children, whose names and ages are as follows: Louis Walter, aged six years; Leroy Edmond, aged four years; Lela Pearl, aged one year.

"That the defendant is not a fit person to have the care, custody and education of said children; that

said plaintiff and defendant separated on the 8th day of January, 1893, and have not since lived or cohabited together; that the defendant is the owner of personal property of the value of six hundred dollars.

"Wherefore, plaintiff prays that the bonds of matrimony heretofore existing between said plaintiff and defendant be dissolved and held for naught, and that said plaintiff be granted a divorce, and that she be given the care, custody and control of the minor children, and that she have judgment for $300 alimony, to be paid as the court may direct, and such other and proper relief as to the court may appear just and equitable."

The foregoing complaint was duly verified, and on the same day plaintiff filed her affidavit in the cause, stating in substance that the defendant was the owner of certain personal property, consisting of six head of horses, one span of mules, one jack, one jenney, two milk cows and calves, together with household goods, all of the aggregate value of six hundred dollars; that she was without means to support herself and children; that defendant had entirely abandoned her and the children and refused to contribute to their support; that she had a meritorious cause of action against defendant, and that defendant was threatening to convey away his said property for the purpose of preventing her from collecting her alimony and preventing her from collecting any judgment she might secure in the action for alimony. She also prayed for an order enjoining defendant from selling or disposing of his property until the final determination of the suit.

A summons was duly issued upon the complaint, entitled as follows: *Eliza Jane Irwin*, plaintiff, *vs. Elorenzo Erwin*, defendant, and on the face of the summons the defendant is designated as *Elorenzo Erwin*, and he is directed to appear and answer to the complaint on the 16th day of February, 1893, and unless

he so appear and answer, that judgment for a decree of divorce and three hundred dollars alimony, statutory attorney fees and costs, will be rendered against him.

Upon the back of the summons appears the certificate of the officer showing service on the 19th day of January, and designating defendant as *Elonzo Erwin*.

On January 14, the same day upon which the complaint and the affidavit for injunction was filed, it appears from the record that the probate judge issued an order allowing a sum of money, the amount not appearing, for the support of plaintiff and her children, during the pendency of the action, and also enjoined defendant from selling or disposing of any of his property during the pendency of the action.

February 16 the defendant appeared and filed a motion, as follows:

"Now comes Lorenzo Irwin, for the purpose of making this motion and for no other purpose whatever, and moves the court to desist from entering any order or decree or judgment against him in the above entitled action, in every particular wherein the same is intended to affect him, the said Lorenzo Irwin, for the following, among other reasons, to-wit:

"'1. Because this court has no jurisdiction in action to obtain a divorce.

"'2. Because nothing appears in any of the pleadings on file in the above entitled cause to authorize or give jurisdiction to any court to entertain a proceeding for divorce.

"'3. Because the pretended summons or process in the above entitled cause is a nulity in its terms, conditions and requirements and does not warrant a court to entertain jurisdiction of any divorce matter thereunder.

"'4. Because all orders made and process issued in the above cause have been so made and issued contrary to law as appears upon the pleadings on file therein.

" '5. Because there is nothing in any of the pleadings, files or process herein to authorize this court to make any order or decree or judgment as against him, the said Lorenzo Irwin.' "

This motion was duly signed by George P. Uhl, attorney for Lorenzo Irwin, and after consideration the same was by the court overruled.

No further or other appearance was made before the probate judge by the defendant, and after passing upon the motion of defendant, which ruling occurred on February 18, the record discloses the following order:

"Be it rembered that now, at this time, 4 o'clock, P. M., February 18, 1893, there being no further business before the court, it is ordered and adjudged that this court be and the same is hereby adjourded."
Attest, February 18, 1893.    Chas W. McGraw, Clerk.

February 20, the plaintiff obtained leave and filed an amended complaint, which corrected the names of both plaintiff and defendant, and, as corrected, they read, *Eliza Jane Irwin*, instead of *Eliza Jane Erwin*, and *Lorenzo Irwin*, instead of *Elorenzo Erwin*, and on the same day called the case for trial and proceeded to hear and determine the questions involved. Judgment was rendered for plaintiff, granting her a divorce and the care, custody and control of the children; also decreed plaintiff alimony, and set aside to plaintiff, as such alimony, six head of horses, one span of mules, one wagon and double harness, one-half of a stack of hay and all household goods belonging to both plaintiff and defendant.

There appears in the judgment rendered a finding to the effect that defendant was commonly known by the name of Lorenzo Irwin, Elonzo Irwin and Elorenzo Irwin, and that his sir name was commonly spelled *Erwin* and *Irwin*.

In the record also appears an order as follows:

"Be it remembered that now, at this time, Febru-

ary 20, 1893, the probate court in and for said county of Payne was duly convened by order of court at the hour of 2 o'clock P. M., etc.   *   *   *

"Among the proceedings actually had were the following, to-wit:"

Then follow the minutes showing the trial and judgment in the case here under consideration.

Upon the record, as thus presented, the defendant below brings the case here for reversal and assigns error as follows:

"1. The probate judge had no jurisdiction in actions for divorce.

"2. The complaint fails to state a cause of action for divorce.

"3. The injunction was improperly issued, there being no notice or bond.

"4. The court was not in session at the time the divorce was granted, the same having been adjourned for the term prior thereto.

"5. The original proceedings were not against plaintiff in error."

## OPINION OF THE COURT.

We think the probate court had jurisdiction in actions for divorce at the time this proceeding was instituted.   Section 4966, laws of Oklahoma, 1890, provide that divorce may be decreed by the district and probate courts of this territory.

Under the Organic Act of Oklahoma, the legislature had no power to vest in probate courts jurisdiction to try causes for divorce, as such jurisdiction was vested in the district courts, § 9 of the Organic Act expressly providing that "said supreme and district courts, respectively, shall possess chancery as well as common law jurisdiction, and authority for redress of all wrongs committed against the constitution or laws of

the United States, or of the territory, affecting persons or property."

This provision of our Organic Act clearly intended to, and did, vest in the district courts of Oklahoma all the powers usually given to district courts of the different states, which includes power to hear and determine actions for divorce. Perhaps, as a better expression of the intention of congress upon this subject, attention should be directed to the latter clause of § 2 of our Organic Act, which reads as follows:

"The supreme and district courts of said territory shall have the same power to enforce the laws of the state of Nebraska, hereby extended to and put in force in said territory as courts of like jurisdiction have in said state; but county courts and justices of the peace shall have and exercise the jurisdiction which is authorized by said laws of Nebraska.    *    *    "

The jurisdiction to hear actions for divorce under the laws of Nebraska was in the district courts. Probate courts, in that state, do not have any jurisdiction in such cases. No question, then, can arise as to the intention of Congress in framing our Organic Act.

Section 4966, *supra*, in so far as it attempted to give the probate courts or this territory jurisdiction in divorce cases, was a nullity until Congress should, in the exercise of its powers, breathe into it life.

This was done, as will be seen by an examination of general § 109, Compiled laws of Oklahoma, 1893. Among other matters that section provides:

"That, in addition to the jurisdiction granted to the probate court and the judges thereof in Oklahoma Territory, by legislative enactment, which enactments are hereby ratified, the probate judges of said territory are hereby granted such jurisdiction in townsite matters and under such regulations as are provided by the laws of the state of Kansas.    *    *    "

If the legislature had no power to give the probate courts jurisdiction in matters of divorce, the act of

Congress ratifying the same was sufficient, and in *Finch vs. United States,* 1 Ok. 396, in passing upon this same question, this court has so held. And in such decision, in considering whether or not it was necessary for Congress, in ratifying the law, to do more than to refer to the same in such a manner as to make certain the intention of Congress, this court said:

"Beyond question the law-making power may pass a statute giving the force of law to an instrument, previous statute or document, without setting it forth at length. It is sufficient if it can be made certain." (Lawson's Rights and Remedies, vol. 7, § 3758, and cases therein cited).

This has frequently been done by congress and no further example need be cited than § 2 of our Organic Act.

We find, then, that the legislature, having clearly intended to vest jurisdiction in probate courts to try and determine actions in divorce, and congress having assented to such legislative enactment, that at the time this suit was instituted in the court below, jurisdiction obtained.

Before we conclude this opinion it will be necessary to again discuss the question of jurisdiction of the probate courts to try and determine actions for divorce under the present laws of Oklahoma. We now pass to the second assignment of error.

It is contended that the complaint fails to state a cause of action. The complaint is very indefinite in its specifications, and if held to be a sufficient complaint in divorce, it must appear so from the allegations therein, which read as follows:

"That on or about February, 1892, and on divers other occasions prior and subsequent thereto, said defendant was guilty of cruel and inhuman treatment to said plaintiff, in this, to wit: slapped said plaintiff. Plaintiff further alleges that for a long time past said defendant has cursed and abused said plaintiff by

calling her vile names.    Plaintiff further alleges that defendant failed, refused and neglected to provide for said plaintiff and children according to his station in life."

The sufficiency of the complaint was not questioned below, in any manner, unless the second ground set forth in the motion of appellant may be considered as having put the complaint in issue.    However that may be, the motion could have no greater effect or force than a demurrer, and had appellant simply filed a demurrer and stood upon the same, he would have saved all the rights he has by filing his motion.

It may be said that the complaint is not drawn in good form, and that the allegations relied upon are for the most part conclusions, yet enough can be gathered from the language used to justify the court in concluding in what manner the appellant has violated the law of marriage contract.

Cruel and inhuman treatment is charged as one of the grounds of complaint.    If the complaint merely stated that appellant had been guilty of cruel and inhuman treatment without specifying in what manner, a demurrer would be sustained to such an allegation. But where the language referred to is followed with or preceded by words specifically setting forth acts which, if supported by evidence, might be sufficient upon which to support a decree, the court would not err in holding that the complaint stated a cause of action. In this case it is alleged that "on or about February —, 1892, and on divers other occasions prior and subsequent thereto, defendant was guilty of cruel and inhuman treatment in this, to-wit:   Slapped said plaintiff."    It is contended that the complaint should show that such slapping was done in anger or with intent to injure the party complaining.    No doubt such an additional allegation would strengthen the complaint and leave nothing to inference.    But the language

used must all be considered together, and, if the intent of the pleader plainly appears, such intention will be sufficient in the absence of a motion to make more definite and certain. In this case it appears from the words used that the defendant, upon numerous occasions, in a cruel and inhuman manner, slapped plaintiff. By the term slapped, is evidently meant struck or beat, and while the latter terms are usually employed to convey the meaning of physical pain, injury or mental distress, yet where the term slapped is used as an evidence of cruel and inhuman treatment, the mind receives the same impression. And so with the second allegation that "for a long time past said defendant has cursed and abused said plaintiff by calling her vile names." This is a charge which upon its face conveys in a direct and positive manner the charge of cruel and inhuman treatment.

The word cursed is susceptible of but one meaning. Its synonyms are malediction, imprecation, execration; where used by one towards another it is intended to convey hate and detestation, and as an invocation for harm or injury. When a husband curses his wife, he is guilty of the grossest character of cruelty and inhumanity. It has been well stated that, "to the credit of woman be it said, that she usually lives in an atmosphere far removed from profanity, and a devoted wife and mother must be inexpressibly shocked when curses fall from the lips of a husband, conveying to her mind the fact that her husband hates and detests her." So, too, in the use of vile names by the husband towards the wife. To a sensitive woman, of virtuous character, in no way could a husband evince his cruelty and inhumanity more completely than by calling his wife vile names; and like the word cursed, the word vile has also a well defined meaning. When used as it appears in the complaint, it means debased, lost to decency, and may mean

much more.   But giving to it the narrowest scope pos-
sible it conveys to the mind, when spoken of a woman,
the impression that she is base, degraded and entirely
wanting in everything that goes to make a woman re-
spectable.   It would add but little to the complaint if
the particular kinds of vileness, which the husband
assumed the wife to be guilty of, was specifically de-
scribed in the complaint; and after consideration we
are of the opinion that, upon its face, the complaint
states a cause of action, and if the defendant was
not fully informed as to the nature of the cause
charged against him, he had his remedy by motion to
make more definite and certain.   It the absence of
such motion the complaint should stand.

The third assignment of error is not well taken.
Section 4975, Oklahoma statutes, provides, among
other matters, for the issuing of an order for the dis-
position of the property of the parties to a divorce
proceeding pending litigation, and the same section
further provides that no bond shall be required of
either party.

However, we find in the fourth assignment of error,
good reasons for setting aside the judgment of the
trial court.   It appears from the transcript of the rec-
ord filed in this case, that on February 18, 1893, the
probate court adjourned, and that the divorce was
granted on February 20, two days thereafter.   The or-
der of adjournment on the 18th is as follows:

"Be it remembered that now, at this time, 4 o'clock
P. M., February 18, 1893, there being no further busi-
ness before the court, it is considered, ordered and
adjudged that this court be, and the same is hereby,
adjourned."

This order is attested by the clerk and by him duly
signed.   It is contended by appellee that it must be
presumed from the fact that the court was in session
on February 20, that it was not finally adjourned on

the 18th, but we cannot presume for or against a record of the trial court; it is here to speak for itself, and if, from its terms, we can determine a fact, we cannot in the least go outside.

In all cases wherein a party seeks a divorce, the pleadings, practice and proceedings in the probate court are the same as if the cause were to be tried in the district court.

The law defining the duties of probate judges (§ 2, art. 14, chap. 19, laws of 1890), provides for holding terms of court on the first Mondays in January, March, May, July, September and November of each year, and continuing so long as shall be necessary. Such law expressly contemplates regular terms of court, opening at stated times, and closing when the business for the term is concluded. These terms are held and conducted in all respects the same as are those of the district courts. It will not be contended that a divorce can be granted by a judge in vacation, nor that a court has power to convene in session after a final adjournment for the term, until the next regular term commences. The langage used by the court in its order adjourning the court on February 18, is almost, if not precisely, what a court would use in making a final adjournment for the term. The statute says that the court shall continue so long as shall be necessary. The order of adjournment reads, "There being no further business before the court," etc., thus following the exact idea of the statute in providing for ending the sessions of the court. Again, does not the fact that no time is fixed in the order adjourning court for the reconvening of the same, conclusively establish the status of the adjournment? If the order had stated that the court adjourned *sine die* would it have been any stronger in effect than the one made?

In Bouvier the definition of the word adjourn is given as follows: "To put off, to dismiss till an appointed day, or without any such apppointment." If an adjournment is had without fixing any specified time, the law determines the time at which the court shall convene, to be at the beginning of the next term.

Suitors and litigants take notice of the law which fixes the commencement of a term of court, but no person can be held to have notice of the convening of a court, unless such notice is given by law, or by the order of the court.

To retain the power within himself and to control the times at which his court shall convene, the judge must at each adjournment specify a time certain as the date when his court will again meet, or lose the power to hold any further sessions until the time as fixed by law. If this were not true, great injustice would frequently happen to litigants. A court could, as was done in the case under consideration, adjourn without fixing a time to again convene, and, at a time entirely optional with the court, again convene and proceed to transact business, render judgments and decrees which might work great injustice, if such business were done in the absence of either of the parties to an action. And yet, no redress could be had by the aggrieved party, because the court would be in regular session and his judgments in all respects in conformity with law. It was not the intention of the legislature to make it possible for courts to so transact their business, and no litigant should be kept in ignorance of the times when the court will sit.

We think the judgment of the lower court was not rendered at a time when the court was, under the law, in session, and, therefore, such judgment is set aside. Holding to this view, it is unnecessary to discuss the sixth assignment of error.

We have reached a point in this case where we deem it necessary to determine whether or not the probate courts of this territory now have jurisdiction to hear and determine actions for divorce, and if not, what disposition should be made of this case. The question of jurisdiction in actions for divorce is one of vital interest in this territory. Should this court fail to pass upon the question at this time the decision rendered in this case would be construed by the public generally in a manner contrary to the judgment of this court, and suits now pending and others instituted would proceed to judgment with the apparent approval of this tribunal. To avoid such a condition, and considering the question fairly in the case for disposition, we will briefly discuss the question.

In this territory, as we have heretofore pointed out, the probate courts had jurisdiction in actions for divorce only because congress assented that they might act in accordance with the law passed by the territorial legislature. This enactment of our legislature will be found in the compiled laws of 1890. Article 31, chapter 70, section 7, of such act, is as follows:

"Divorce may be decreed by the district and probate courts of the territory on petition filed by any person who, at the time of filing such petition, is, and shall have been, a *bona fide* resident of the territory for the last two years previous to the filing of the same, and a *bona fide* resident of the county at the time of and for at least six months immediately preceding the filing of such petition, which *bona fide* residence shall be duly proven by such petitioner to the satisfaction of the court trying the same, by at least two witnesses who are resident free holders and house holders of the territory. * * *"

It will be observed that the complaint filed in this cause alleges that the plaintiff was within the requirements of the law relative to her residence.

Nowere, except in the statute above quoted, did the legislature of this territory attempt to confer jurisdic-

tion upon the probate courts to try and determine actions for divorce.

In chapter 50, laws of Oklahoma, 1890, the legislature of this territory, under the head of "Marriage Contracts," vested the jurisdiction in the district courts to dissolve the marriage relations. (Section 1, article 2, *supra*.)

Such a provision is not a part of the legislative enactment, ratified by congress, and the jurisdiction given to the probate court being a limited one, it can take nothing except that expressly granted.

The last legislature repealed, in toto, the act passed in 1890, granting to probate courts jurisdiction in divorce proceedings, and we now have upon our statutes only the one law of divorce, found in art. 28, chap. 66. This law places the jurisdiction to try and determine actions for divorce exclusively in the district courts. It provides grounds for divorce in addition to those enumerated in the laws of 1890, and it was the evident intention of the legislature to do away with the granting of divorces by the probate courts of this territory. It is for this court now to determine whether or not the legislature could take from the probate courts a jurisdiction granted in the manner heretofore pointed out.

It will be conceded in the outset that congress may legislate for a territory or grant that power to the people themselves, who act through their legislature. Thus congress may pass an entire code of laws for the government of its territories and make no provision whatever for the convening of the legislatures. But to further the best interests of the people of a territory, to inculcate in them a spirit of self-government, thereby making them sooner fitted for statehood, congress has seen fit to pass an Organic Act, which operates as a constitution, for the territory. Within the lines laid down in such Organic Act the legislature

may pass laws, and it may be said that what is not prohibited is within the power of the legislature to act upon. The Organic Act, having limited the jurisdiction of the probate courts, it was beyond the power of the legislature to enlarge such jurisdiction. Therefore, when the legislature attempted to give to the probate courts power to grant divorces they exceeded the legislative grant expressed in the Organic Act, congress having kept the entire control of that matter. In order to give life to the act of the legislature, congress spoke as follows:

"Provided, that in addition to the jurisdiction granted to the probate court and the judges thereof, which enactments are hereby ratified, the probate judges are hereby granted such jurisdiction in townsite matters," etc.

Did Congress intend this as original or permissive legislation? Did such ratification have the same force and effect as if made a part of the Organic Act, or did Congress merely intend to enlarge the powers theretofore granted to the legislature? If the former, the jurisdiction of the probate courts remain. If the latter, the repeal of the law by the legislature carried with it the repeal of the jurisdiction of the probate courts.

There is but little of authority from the courts upon this question. In Utah, in *Cast vs. Cast*, 1, 112, the supreme court held that under their Organic Act, in effect the same as that of this territory, the probate courts had no jurisdiction in divorce proceedings. Afterward, in *Ferris vs. Higley*, 20 Wallace 375, the supreme court of the United States held to the view that the act of the territorial legislature conferring on the probate courts a general jurisdiction in civil and criminal cases, both in chancery and at common law, was inconsistent with the Organic Act of Utah, and therefore void. Subsequently the supreme court of Utah,

in *Whitmore vs. Hardin*, vol. 3, 121, in effect reversed the former decision of the supreme court of that territory and held that the legislature could properly grant to probate courts jurisdiction in actions for divorce. But after the decision in *Cast vs. Cast*, and before the later decision in *Whitmore vs. Hardin*, Congress passed an act, approved June 23, 1874, which expressly conferred upon the probate courts of Utah concurrent jurisdiction with the district courts in matters of divorce. In *Whitmore vs. Hardin*, the case did not turn upon the question of jurisdiction, as that matter had been put at rest by Congress; but was considered upon the proposition of the effect to be given to a decree of divorce granted by a probate court at a time prior to the date upon which Congress had acted.

The court very ably reviews the whole matter and concludes that the legislative enactment, in so far as it confirmed jurisdiction in probate courts in divorce proceedings, was valid. The theory upon which the court reached its conclusion was, that at the time this government was created, independent of Great Britain, neither the common law nor chancery courts of England had jurisdiction in actions for divorce, but such jurisdiction was vested in the ecclesiastical courts; the last named courts also had jurisdiction of cases which in this country are given to the probate courts. That congress, in adopting the Organic Act of Utah, had provided that the jurisdiction of cases arising in that territory should be in the supreme, district and probate courts and justices of the peace, giving to district courts common law and chancery jurisdiction, and that such jurisdiction did not refer to actions for divorce, because it did not obtain in the common law and chancery courts.

In examining the decision by which the court arrived at this conclusion, one is impressed somewhat with

the fact that, for the first twenty years of the exist-ence of that territory, the probate courts had exclu-sive jurisdiction in matters of divorce.   That the legis-lative enactment granting such jurisdiction was not questioned until the decision was rendered in *Cast vs. Cast, supra,* and that property rights, supposed to have been settled for years, were dependent upon sus-taining the validity of the jurisdiction of the probate courts.   And after considering the decisions within our reach we have but little to guide us and must de-termine the question from the standpoint of reason.

Jurisdiction to try actions for divorce is conferred by legislative enactment.   In this country it does not inhere in any court, and such jurisdiction must be by express statute, or by such plain intendment as to be equivalent to an express statute.

It is well settled then that the probate courts in this territory can have no jurisdiction in actions for divorce except such as is conferred by special enact-ment, and that the legislature of this territory had not the power to vest in such courts the jurisdiction.

We need not close our minds to the circumstances surrounding the action of congress in ratifying the act of our territorial legislature, and the reasons why such legislature passed two separate divorce laws at its first session.

By reason of a contention for the location of the territorial capital, almost the entire time of the ses-sion of the legislature was spent before any attempt was made to pass a code of laws for our territory. Congress provided that the laws put in force by our Organic Act should cease to be the law of the terri-tory at the adjournment of the first session of the leg-islature.   Near the end of such session the legislature hastily adopted portions of codes from different states, and, in so doing, in some instances, adopted conflicting laws upon the same subject, and especially

upon divorce. Thus, under the head of "Marriage Contract" the jurisdiction in divorce proceedings was placed in the district courts and a ninety days' residence was all that was required to enable a person to commence proceedings; while under "Procedure Civil," jurisdiction in such actions was placed in both district and probate courts, and a residence of two years was made a prerequisite to the commencement of the action. And in many other respects our statutes were inharmonious. In some instances our legislature enacted laws entirely beyond the scope of their power, notably one in relation to contest cases before the United States land offices. Congress had made no provision for compelling the attendance of witnesses before the United States land offices, and, in order to cure such defect, the legislature passed a law providing that any person might be compelled to answer to a summons issued out of a probate court, there made to give his testimony under penalty for contempt, and that such testimony should be reduced to writing and forwarded to the land office, to be received by the register and receiver and considered by them as fully as if such testimony had been taken in the land office. There was much debate in the legislature as to the effect of this law, and whether or not it was one within the power of the legislature to pass.

There was but small consideration given to the subject of divorce. When congress passed its ratifying act it included the laws of the legislature, relative to compelling the attendance of witnesses before probate judges in contest cases in the land offices, as well as the law granting jurisdiction to probate courts in divorce proceedings.

It is fair to presume that at the time congress passed the ratifying act that body particularly had in mind the legislative enactment relating to compulsory methods of obtaining testimony in land office proceed-

ings, because such law was subjected to a great deal of public criticism. Suppose that the legislature should attempt to repeal such laws, carrying with such repeal the procedure providing that the register or receiver must issue the notice and authority to take the testimony. The repeal would unquestionably make the jurisdiction worthless because it would leave no procedure whereby such jurisdiction could become operative, and we do not doubt that the procedure and practice are matters entirely within the control of the legislature.

It will be seen, therefore, that congress must have intended to place in the legislature much of the responsibility for carrying into effect the laws enacted by such body.

The interpretation of a statute has been well stated as "the art of finding out the true sense of any form of words; that is, the sense which their author intended to convey and of enabling others to derive from them the same idea which the author intended to convey." It is for this court to declare the intent of congress. If such intent appears in the language used we need investigate no farther, but must content ourselves with declaring such intent. Reverting again to a principle formerly announced, that congress may legislate for a territory or permit the people of such territory to act through its own legislature, it will be seen that this act emanated first from the legislature; that it was a thought or purpose which had no place in the mind of congress until presented to that body by the people of this territory through its chosen body, the legislature. The law never would have had an existence as an independent creation by congress. It was by grace of congress that this territory was permitted to act in the matter.

Blackstone divides laws into four parts: Declaratory, directory, remedial and vindicatory. Later

authors have made other distinctions; and there is one class of statutes which may be denominated as permissive, and which come under the head of declaratory statutes as defined by Blackstone.

In speaking of permissive statutes, Sutherland lays down this rule: "When statutes are couched in words of permission or declare that it shall be lawful to do certain things, or provide that they may be done, their literal signification is that the persons, official or otherwise, to whom they are addressed, are at liberty or have the option to do those things or refrain, at their election."

What is the signification of the language used by congress in ratifying the divorce act of our legislature? Considering the circumstances surrounding the passage, by congress, of such act, we are bound to presume that congress had given the matter but little, if any, thought, for the reason that attention had mainly been directed to another act of our legislature.

Neither can it be said that the wisdom of granting to probate courts jurisdiction in actions for divorce was a matter of concern to that body. Neither do we think that in the hasty manner in which the legislature passed the act, had such body ever seriously considered the question of extending to the probate courts jurisdiction in divorce actions. In fact, we believe that the passage of the law by our legislature was unintentional and that the same thing is equally true of congress. But, however that may be, we regard the action of congress as being in the nature of a license to the legislature of this territory; as of not having been intended as a command, but as a permission, and that the law should have no greater effect than a law of our legislature. That congress did not, by ratifying the legislative enactment, place it without the power of such legislature to repeal the same, and this being true, it follows that where the

act was repealed, such repeal carried with it the juris-
diction of the probate courts.

Some question may arise in the mind of the lower
court as to the proper disposition of this cause when
it shall again come before that tribunal; and we deem it
proper to state that, in our opinion, § 754, of the
Code of Civil Procedure, has a clause which provides
that such court may again try this cause. That such
court, having had jurisdiction when the action was in-
stituted, has not lost such jurisdiction because the
legislature in adopting the present code also incorpo-
rated a saving clause in the section referred to which
is broad enough to permit the court below to proceed
until the final determination of this action.

The judgment of the lower court is reversed and the
cause remanded for rehearing.

All Justices concurring except :

SCOTT, J., dissents: I must dissent from the opinion
of the court in this case, and, with due respect for the
judgment of my associates, I shall take strong grounds
against their decision as wholly unsupported by au-
thority, such as to warrant the construction placed
upon the points of law involved. I shall speak as
briefly as possible to present my views of the law
of the case.

I am called upon to concur in a holding that the
probate courts of Oklahoma Territory, under the pres-
ent statutes, have no jurisdiction in actions for di-
vorce, at a time when the question is not properly
before this court. The court reverses this case on
grounds that fully justify such a holding, viz.: that the
lower court had, in law, adjourned its session *sine die*,
when the cause was tried and determined, and that,
hence, its proceedings were *coram non judice*, and void.
In the judgment of reversal, upon this ground as
stated, I fully concur. The court then goes on to
determine a question not before it, which may be

stated in the language of the court as contained in the opinion, thus:

"We have reached a point in this case where we deem it necessrry to determine whether or not the probate courts of this territory now have jurisdiction to hear and determine actions for divorce, and if not, what disposition should be made of this case. The question of jurisdiction in actions for divorce is one of vital interest in this territory. Should this court fail to pass upon the ·question at this time the decision rendered in this case would be construed by the public generally in a manner contrary to the judgment of this court, and suits now pending and others instituted would proceed to judgment with the apparent approval of this tribunal. To avoid such a condition, and considering the question fairly in the case for disposition, we will briefly discuss the question."

The court then goes on to discuss the question as will be shown hereafter in this dissent, and concludes as follows:

"Some question may arise in the mind of the lower court as to the proper disposition of this cause when it shall again come before that tribunal, and we deem it proper to state that in our opinion, section 754 of the Code of Civil Procedure has a clause which provides that such court may again try this cause. That such court having had jurisdiction when the action was instituted has not lost such jurisdiction, because the legislature, in adopting the present code, also incorporated a saving clause in the section referred to, which is broad enough to permit the court below to proceed until the final determination of this action.

"The judgment of the lower court is reversed and the cause remanded for rehearing."

I concur with the court in its determination that this case should be tried *de novo* in the lower court under the law as it existed at the time this action was instituted, but I dissent from the holding that a decision is necessary or proper, at this time, in this case,

as to the present jurisdiction of probate courts in actions for divorce.

This case was filed in the probate court of Payne county, on January 14, 1893, and exception could not have been taken or saved as to jurisdiction, which has been conceded by the court to have existed until August 14, 1893, the date the Kansas code went into effect. It was an action pending, before the Civil Code of Kansas, as adopted by the legislature, went into effect; hence, the case comes fully within the saving clause enacted by the legislature, at the same time, (Stat. of 1893, p. 888, § 4633), referred to by the court, which reads as follows:

"The provisions of this code do not apply to proceedings in actions or suits pending when it takes effect.    They shall be conducted to final judgment or decree, in all respects as though it had not been adopted.    But the provisions of this code shall apply after a judgment, order or decree heretofore or hereafter rendered to the proceedings to enforce, vacate, modify or reverse it.

The court holds the judgment to be absolutely void. In this much I have concurred, and, of course, the rendition of a void judgment by the lower court, without the fault of the parties, should not deprive either of them of the right to have the action determined under the law as it existed at the date it was instituted, and the saving clause just quoted was designed to achieve this end.    Hence the question decided, in the nature of things, cannot in any conceivable manner now be injected in this case, by either of the parties, and much less by the court.    It is certainly gross error to determine a legal proposition affecting the jurisdiction of an inferior court without the question comes to us for consideration in the manner and form provided by law, and without first permitting such inferior court to pass upon its own jurisdiction. The action of this court is a determination of the

jurisdiction of another court upon a jurisdictional question not before it, and the determination of this jurisdictional question must appear at once to be in the nature of a proclamation or manifesto to the public, that the probate courts have no jurisdiction in divorce actions. I cannot bring myself to conclude that the opinion of the court upon this proposition, under the circumstances, reaches the dignity, or is even comparable to *obiter* or *gratis dictum*, although it will receive the respect due to the private opinion of the learned judge delivering the same and the other members of the court concurring therein. This jurisdictional question is just as distinct from the one raised in this case, viz.: that the lower court had adjourned *sine die*, as though the case appealed had been a replevin suit tried in the same manner and under the same circumstances in the probate court, and, as a matter of course, if this be true, it cannot be held binding on this court as a precedent, and consequently can have no significance as a judicial decree. The court appears to apprehend that the probate courts will mistake their jurisdiction, and, in order to avoid this, and in order to advise the public of this fact, issues a public decree or proclamation to beware! With the same reason the court should not stop at defining the jurisdiction of probate courts in divorce actions, but should also take up the subject of replevin, attachment, money demand, damages, libel and slander, partition, etc., and advise the probate court of its jurisdiction in such actions. More than this, with the same reason, the district courts and all inferior courts should be advised and instructed as to their jurisdictional bounds. If this were correctly declared, and the inferior courts should abide by the direction and instruction, no errors would ever be committed in the lower courts, and consequently no cases would come to this court on appeal, unless, perchance, the court

should fail to instruct them upon a legal question that might arise in the course of their proceedings. This would revolutionize the functions of the supreme court as an appellate tribunal, and convert the inferior courts into machines to execute the laws as directed in these proclamations, that would be but little variant from the manifestoes of a sovereign to his subjects, to observe the laws of the realm.

All this is so obviously out of place as a function of the supreme court as an appellate tribunal, that I cannot content myself to further discuss the proposition. I cannot assent to the exercise of such extraordinary supervisory jurisdiction. I solemnly and earnestly, but respectfully, assert it to be an unwarranted exercise of appellate powers contrary to the plain provisions of our statutes and the law of the land.

I regard this point as fatal, but as the court concludes by a denial of the jurisdiction of the probate courts to hear and determine actions for divorce upon principles to which I can never agree, I feel it my duty to follow the reasoning in the opinion, specifying my grounds of dissent, lest my silence might be taken as an assent to the law as therein laid down upon the various propositions.

That there may be no mistake as to the grounds of my dissent, I quote from the opinion of the court as follows:

"We need not close our minds to the circumstances surrounding the actions of congress in ratifying the act of our territorial legislature, and the reason why such legislature passed two separate divorce laws at its first session.

"By reason of the contention for the location of the territorial capital, almost the entire time of the session of the legislature was spent before any attempt was made to pass a code of laws for our territory. Congress provided that the laws put in force by our

Organic Act should cease to be the law of the terri-
tory at the adjournment of the first session of the
legislature.    Near the end of such session the legis-
lature hastily adopted portions of the codes from dif-
ferent states, and in so doing in some instances
adopted conflicting laws upon the same subject, and
especially upon divorce.    Thus under the head of
'Marriage Contract' the jurisdiction in divorce was
placed in the district courts and a ninety days' resi-
dence was all that was required to enable a person to
commence proceedings; while under 'Procedure Civil,'
jurisdiction in such actions was placed in both dis-
trict and probate courts, and a residence of two years
was made a prerequisite to the commencement of the
action, and in many other respects our statutes were
inharmonious.    In some instances our legislature en-
acted laws entirely beyond the scope of their power,
notably one in relation to contest cases before the
United States land offices.    Congress had made no
provision for compelling the attendance of witnesses,
before the United States land offices, and, in order to
cure such defects, the legislature passed a law pro-
viding that any person might be compelled to
answer to a summons issued out of the probate court,
there made to give his testimony under penalty for con-
tempt, and that such testimony should be reduced to
writing and forwarded to the land office to be received
by the register and receiver, and considered by them
as fully as if such testimony had been taken in the
land office.    There was much debate in the legislature
as to the effect of this law, and whether or not it was
one within the power of the legislature to pass.

"There was but small consideration given to the
subject of divorce.    When congress passed its ratify-
ing act, it included the law of the legislature relative
to compelling the attendance of witness before pro-
bate judges in contest cases in the land office, as
well as the law granting jurisdiction to probate courts
in divorce proceedings.

"It is fair to presume that at the time congress
passed the ratifying act, that body particularly had
in mind the legislative enactments relative to compul-
sory methods of obtaining testimony in land office
proceedings, because such law was subjected to a

great deal of public criticism. Suppose that the legislature should attempt to repeal such law, carrying with such repeal the procedure providing that the register or receiver must issue the notice and authority to take the testimony. The repeal would unquestionably make the jurisdiction worthless, because it would leave no procedure whereby such jurisdiction could become operative, and we do not doubt that the procedure and practice are matters entirely within the control of the legislature.

"It will be seen, therefore, that congress must have intended to place in the legislature much of the responsibility for carrying into effect the laws enacted by such body.

"The interpretation of a statute has been well stated as 'the art of finding out the true sense of any form of words; that is, the sense which their author intended to convey and of enabling others to derive from them the same idea which the author intended to convey.' It is for this court to declare the intent of congress. If such intent appears in the language used, we need not investigate further, but must content ourselves with declaring such intent. Reverting again to a principle formerly announced, that congress may legislate for a territory or permit the people of such territory to act through its own legislature, it will be seen that this act emanated first from the legislature; that it was a thought or purpose which had no place in the mind of congress until presented to that body by the people of this territory, through its chosen body, the legislature.

" * * * What is the signification of the language used by congress in ratifying the divorce act of our legislature? Considering the circumstances surrounding the passage, by congress, of such an act, we are bound to presume that congress had given the matter but little, if any, thought, for the reason that attention had been directed to another act of our legislature.

"Neither can it be said that the wisdom of granting to probate courts jurisdiction in action for divorce was a matter of concern to that body. Neither do we think that in the hasty manner in which the legisla-

ture passed the act, had such body ever seriously considered the question of extending to the probate court jurisdiction in divorce actions. In fact, we believe that the passage of the law by our legislature was unintentional, and that the same thing is equally true of congress. But, however that may be, we regard the action of congress as being in the nature of a license to the legislature of the territory. As not having been intended as a command, but as a permission, and that the law should have no greater effect than the law of our legislature. That congress did not, by ratifying the legislative enactment, place it without the power of such legislature to repeal the same, and, this being true, it follows that when the act was repealed, such repeal carried with it the jurisdiction of the probate court."

The propositions of law that I will discuss are too well known to the bench and the bar to need citation of numerous authorities, and the legislative enactments that bear upon the question to be determined are too clear and expressive to require the application of the rules of statutory construction. In the first place it is well understood that in England, prior to 1857, the subject of divorce belonged to the ecclesiastical courts and to parliament. Stat. 20 and 21 Vic. 1857, ch. 85, created a court of divorce and matrimonial causes, with exclusive jurisdiction in all matrimonial affairs. They are now heard in the probate and divorce divisions in the high court of justice. In our country it was formerly a very common thing for the legislature to grant divorces by special acts; but this rarely occurs now, and in many states it is forbidden by the constitution. In nearly all the states the jurisdiction is conferred upon the courts possessing equity powers. Divorce jurisdiction is *sui generis*. It has never been classed as either civil or criminal. It has never been understood in law that the inhibition upon the legislative department against exercising judicial functions prevents the legislature from granting divorces, notwithstanding the exercise of such power

may involve a judicial investigation. Unless forbidden by the constitution, the legislature of a state may grant divorces. A notable instance of the exercise of this power by a territorial legislature, is reviewed in the case of *Maynard vs. Hill*, 125 U. S. 203-209. In this case, Field, justice, speaking for the court, held that the act of December 22, 1852, of the Territory of Oregon, divorcing one Maynard and wife, was constitutional. To this last named question I will advert later for a brief discussion of the inherent power of a state or territorial legislature to grant divorces or confer the jurisdiction upon the courts within their legislative domain.

Thus our divorce jurisdiction descended, and a brief review of it brings us to the undisputed proposition that, before a court can exercise jurisdiction in action for divorce in this country, such jurisdiction must be conferred by express statutory authority. About this there can be no contention. It is a principle of law that no lawyer or court of to-day would controvert. The court in this case announces this rule as follows:

"Jurisdiction to try actions for divorce is conferred by legislative enactment. In this country it does not inhere in any court and such jurisdiction must be by express statute, or by such plain intendments as to be equivalent to an express statute."

The jurisdiction of the probate courts of this territory is then declared by the court thus:

"It is well settled, then, that the probate courts in this territory can have no jurisdiction in actions for divorce except such as is conferred by special enactment, and that the legislature of this territory had not the power to vest in such court the jurisdiction."

The court further declares that congress conferred jurisdiction upon the probate courts by ratifying certain acts of the territorial legislature, reaching its

conclusions from a consideration of the following several provisions:

"Section 9. That the judicial power of said territory shall be vested in a supreme court, district courts, probate courts, and justices of the peace. The supreme court shall consist of a chief justice and two associate justices, any two of whom shall constitute a quorum. They shall hold their offices for four years, and until their successors are appointed and qualified, and they shall hold a term annually at the seat of government of said territory. The jurisdiction of the several courts herein provided for, both appellate and original, and that of the probate courts and of the justices of the peace, shall be as limited by law, provided, that justices of the peace, who shall be elected in such manner as the legislative assembly may provide by law, shall not have jurisdiction of any matter in controversy when the title or boundaries of land may be in dispute, or where the debt or sum claimed shall exceed one hundred dollars; and said supreme and district courts, respectively, shall possess chancery as well as common law jurisdiction, and authority for redress of all wrong committed against the constitution or laws of the United States or of the territory affecting persons or property."

Section 4966, page 903, Statutes of Oklahoma, 1890, reads:

"Divorce may be decreed by the district and probate courts of this territory on petition filed by any person, who, at the time of filing such petition, is and shall have been a *bona fide* resident of the territory for the last two years previous to the filing of the same, and a *bona fide* resident of the county at the time of and for at least six months immediately preceding the filing of such petition, which *bona fide* residence shall be duly proven by such petitioner, to the satisfaction of the court trying the same, by at least two witnesses who are resident free holders and householders of the territory. And the plaintiff shall, with his petition, file with the clerk of the court an affidavit, subscribed and sworn to by himself, in which he shall state the length of time he has been a resident of the territory, and stating particularly the place,

town, city or township in which he has resided for the last two years past, and stating his occupation, which shall be sworn to before the clerk of the court in which said complaint is filed."

Section 3376, of the Statutes of 1890, reads:

"Marriage is dissolved only—

"1. By the death of one of the parties; or

"2. By the judgment of a court of competent jurisdiction decreeing a divorce of the parties.

"The effect of a judgment decreeing a divorce is to restore the parties to the state of unmarried persons. The district court in each county or subdivision has such jurisdiction in an action as is provided in civil procedure."

Section 1639, id., makes the procedure of the district courts applicable to cases pending in the probate court:

"In all cases commenced in said probate court wherein the sum exceeds the jurisdiction of justices of the peace, the pleadings and practice and proceeding in said court, both before and after judgment, shall be governed by the chapter on civil procedure of the territory governing pleadings and practice and proceedings in the district court. In all cases commenced in said probate court that are within the jurisdiction of justices' courts, the practice and proceedings and pleadings, both before and after judgment provided for in the justices' procedure of the territory, shall be applicable to the practice, pleadings and proceedings of said probate court."

Congress subsequently ratified these several provisions of the legislature, which ratifying clause will be found at page 1026, vol. 26, U. S. Statutes at Large, Supplement Revised Statutes U. S. p. 929.

"Provided that, in addition to the jurisdiction granted to the probate court, and the judges thereof, in Oklahoma Territory, by legislative enactments, which enactments are hereby ratified, the probate judges of said territory are hereby granted such jurisdiction in townsite matters, and under such regulations as are provided by the laws of the state of Kansas."

The territorial legislature at its last session (1893), adopted the civil code of procedure of the state of Kansas. It is now in force and contains no grant of jurisdiction to probate courts to hear and determine actions for divorce. The subject then is thus concentrated.

Is an act of congress necessary to invest jurisdiction in the probate courts in actions for divorce? If this be true in point of law, will anything short of an original act of congress, or its equivalent in the shape of congressional legislation, confer such jurisdiction?

Conceding the premises of the majority of this court that the act referred to is a permissive statute, (which I by no means do), is not a permissive statute as complete an act of congress as any other, and can a territorial legislature repeal a permissive statute enacted by congress, any more than any other?

If an act of congress is necessary to confer upon probate courts jurisdiction in divorce actions, do not the probate courts possess that jurisdiction still, in the absence of an act of congress repealing it?

Is an act of congress ratifying an act of the territorial legislature an act of congress, and, if it is, can a territorial legislature repeal it?

Is not the act of congress referred to a remedial statute, and not a permissive one?

Is not one of the offices of a remedial statute to ratify a previous enactment, curing defects and making it valid?

Has the legislature in this territory the inherent power to grant divorces, and, if so, has it the power to confer jurisdiction upon the probate courts?

These are all questions that appeal to common reason and understanding, as well as legal principles. I will first concede, for the sake of argument, that the court is correct in its conclusion that, without an act

of congress, or without the clause ratifying the act of the territorial legislature, the probate courts of this territory could not lawfully have exercised divorce jurisdiction.    Conceding this proposition, then, the question is thus simplified:  Does the ratification of this territorial legislation reach the dignity of an act of congress?    If so, then the territorial legislature cannot repeal it; if not, then the probate courts never had jurisdiction in divorce cases.

The majority opinion of the court declares that the probate courts must obtain their jurisdiction from congress, and, to be consistent, should admit one or the other of the propositions—that the probate court never had any jurisdiction in divorce cases, or that they have it still.    Assuming the correctness of the premises, the proposition is self evident, and, consequently, unanswerable.    Logic, pure or applied, would lose its force in all it embraces, in the face of such a proposition.    When a bill passes both houses of congress and receives the signature of the president of the United States, according to law, containing an enacting clause and embracing but one subject, within the constitutional meaning, who is able to consistently say that it is not an act of congress?    Indeed it would be just as reasonable to contend that an act of congress is not an act of congress.    It makes no difference whether the act ratifies the enactment of a territorial legislature or revises the tariff laws of the United States, the subject matter of the legislation becomes an act of congress just the same.

If the territorial legislature can repeal this part of the jurisdiction so granted, why may it not, if the reasoning of the court be correct, repeal all the jurisdiction conferred upon the probate court by the Organic Act, and otherwise, and abolish the office? If the territorial legislature cannot enlarge this jurisdiction, how can it take such jurisdiction away?    The

reasoning of the court, in my judgment, is unsound in contending that because congress gave approval to the territorial act by ratification, instead of conferring the jurisdiction by passage of an original bill, that it is within the power of the legislature to take away such jurisdiction at its pleasure.    I fail to see the distinction thus sought to be drawn.    If the statute was an absolute nullity before its ratification by congress, to confer the jurisdiction and remedy the ·mischief, the superior legislative authority of congress became necessary, and it makes no difference whether the grant came as a ratification of the void act already framed and passed by the territorial legislature, or whether congress itself framed a law in words and terms exactly like it.

The learned chief justice, in speaking for the court in this case, denotes the act of congress as a permissive·statute, and classes a permissive statute as one ''which comes under the head of declaratory statutes as defined by Blackstone,'' but with this conclusion I cannot agree, even for the sake of argument.    It is purely a remedial statute, as clear, expressive, comprehensive and unmistakable as any ever enacted by a legislative body.    I quote further from the opinion of the court:

''The law never would have had an existence as an independent creation by congress.    It was by the grace of congress that this ·territory was permitted to act in the matter.    Blackstone divides laws into four parts—declaratory, directory, remedial and vindicatory.    Later authors have made other distinctions; and there is one class of statutes which may be denominated as permissive, and which come under the head of declaratory statutes as defined by Blackstone.''

The opinion defines a permissive statute thus:

''In speaking of permissive statutes, Sutherland lays down this rule:    'When statutes are couched in

words of permission or declare that it shall be lawful to do certain things, or provide that they may be done, their literal signification is that the persons, official or otherwise, to whom they are addressed, are at liberty, or have the option, to do those things or refrain at their election."

If a discussion of elementary principles is necessary to determine this question, correct premises should be assumed in the beginning. The act of congress referred to is not a permissive statute, as stated by the learned chief justice. but a remedial one, as before stated. Sutherland on Statutory Construction, at § 434, thus defines remedial statutes:

"These have been defined in very general terms as those which, in brief, are made to correct defects in the existing law—for amendments of the law; those which have for their object the redress of some existing grievance, or the introduction of some regulation conducive to the public good. They may be either affirmative or negative, as they command or prohibit anything in particular to be done or omitted. Guided by the general principles which underlie and justify liberal construction, the court must continually add to the list; for, in the construction of fluctuating and luxuriance of legislation by the numerous legislative bodies of this country, there will be frequent occasions to apply these principles to new cases to cure defects and abridge superfluities which, in the phrase of Blackstone, 'arise either from the general imperfection of all human law, from the change of time and circumstances, from mistake and unadvised determination of unlearned, or even learned, judges, or from any other cause whatever.' Instances are chiefly valuable as illustrations of these principles, and to teach their true scope and spirit. Statutes enacted to promote and facilitate the administration of justice are prominent in the catagory of remedial statutes. Acts providing for a change of venue for convenience of witnesses or to obtain an impartial trial, regulating the practice of law, or to expedite litigation, are remedial." (See, also, authorities cited. *Bearpark vs. Hutchinson*, 7 Bing., p. 186; *Van Hook vs. Whitlock*, 2 Ed., ch. 304-310; *Fairchild vs. Gwynne*, 16

Aub., Pr. 31; 1 Cooley Black Com., 86, 87; *Mitchell vs. Mitchell.* 1 Gill, 66 ; *Griffin vs. Leslie,* 20 Md. 15; *Wright vs. Hammer,* 5 Id. 375; *Houget vs. Tibbetts,* 4 Cow. 384; 2 Inst. 251, 325, 393.)

Blackstone's definition of a declaratory law is "one whereby the rights to be observed and the wrongs to be eschewed are clearly defined and laid down."

Cooley, in his admirable work on Constitutional Limitations, p. 112, says:

"Legislation is either introductory of new rules or declaratory of existing rules. A declaratory statute is one which is passed in order to put an end to a doubt as to what is the common law or the meaning of another statute, and which declares what it is and ever has been." (Bouv. L. D., Statute; Austin on Jurisprudence, sec. 37.)

Sutherland on Statutory Construction, at section 205, defines a permissive statute thus:

"A permissive statute is one which allows certain acts or things to be done without commanding them; as, for example, when it allows persons of a certain description, or indeed any person to make a will, to pre-empt lands, to vote, or to form corporations. Of this nature is a statute which permits a candidate at an election at the polling place, or canvass, or that a clergyman accused of an ecclesiastical offense to attend the proceedings of the commission appointed to inquire into the accusation. Such statutes confer a privilege of license which the donee may exercise or not, at pleasure, having only his own convenience or interest to consult." (See also authorities cited: Potters Dwar., 74; Endl. on St. Int., sec. 310; *Nicoll vs. Allen,* 1 B. & S., 934; *Brockbank vs. Whitehaven R. Co.,* 7 H. & N., 834; *Rockwell vs. Clark,* 44 Conn. 534.

Our own supreme court, in *Chandler vs. Colcord,* 266, referring to the act of congress in question, Green, C. J., uses this language:

"The act of congress is a remedial statute and should be liberally construed to effect the purpose intended; and it is the opinion of the writer that congress

intended to, and did, ratify the whole act of the legislative assembly, as well as the provisions extending the jurisdiction of the probate court, as the provisions which furnish the procedure and give the appeal."

From this eminent authority it will be observed that the intention of the court that the statute is a permissive one, and only intended as a license or permission to the legislature, is not based upon sound reasoning or supported by authority. If congress had intended to permit the legislature to repeal the law at its pleasure, the statute would have contained a proviso to that effect, and that portion of the act would have been permissive. "Permission or license, which," as Sutherland says, "may be exercised or not at pleasure." I am unable to understand upon what theory the court could reasonably proceed to construe a remedial statute as a permissive one, when it contains no language of permission, direct or implied, upon which to base such construction. The opinion of the court, in this respect, as will be observed by a perusal of it, or that portion quoted, seems to be based upon the alleged fact that neither congress nor the legislature had given this question much consideration, and the act was ratified hurriedly, improvidently and unintentionally, and because it had been framed and adopted by our own legislature instead of being enacted as an original bill by congress, it thereby became and was intended as a permissive statute, and upon this reasoning hold it to be permissive, "under the head of declaratory statutes as defined by Blackstone." I know of no such rule for the construction of statutes. A clear, unambiguous statute needs no construction except what the language itself gives. It is only in cases where the language is ambiguous that the courts seek to determine the legislative intent. Section 237, Sutherland on Statutory Construction, reads as follows:

"It is beyond question the duty of the court, in construing statutes, to give effect to the intent of the law making power, and seek for that intent in every legitimate way; but, first of all, in the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation." (See authorities cited.)

Marshall, C. J., in *Schooner Paulinas Cargo vs. United States*, 7 Cranch 52, referring to an act of the legislature of Rhode Island, says:

"In construing these laws, it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words which the legislature has employed to convey it."

The statute itself furnishes the best means of its own exposition, and if the sense in which the words were intended to be used can be clearly ascertained from its parts and provisions, the intention thus indicated will prevail without resorting to other means of aiding in the construction. (Sutherland on Stat. Con. § 2051 id: *Green vs. Weller*, 32 Miss. 650.)

Even when the court is convinced that the legislature really meant or intended something not expressed by the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of language which is free from ambiguity. (*State vs. Smith*, 66 Md. 215; *Woodberry vs. Berry*, 18 Ohio, St. 456; *Bradberry vs. Wagenhorst*, 54 Pa. St. 182.)

If the legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety and policy of its passage. (25 Mich. 99; 50 N. Y. 553.) The courts have, then, no power to set aside or evade its operation by forced and unreasonable construction. If it has been passed improvidently,

the responsibility is with the legislature and not with the courts. (31 Md. 201; 51 Miss. 361 and 735; 10 Ga. 190.) When the meaning of a statute is clear and its provisions are susceptible of but one interpretation, that sense must be accepted as the law. The consequences, if evil, can only be avoided by a change of the law itself, to be effected by the legislature and not by judicial construction. (*Arthur vs. Morrison*, 96 U. S. 108.) When the words of a provision are plainly expressive of an intent not rendered dubious by the context, no interpretation can be permitted to thwart that intent; the interpretation must declare it, and it must be carried into effect as the sense of the law. (49 N. Y. 465; 7 Kas. 35; 63 Barb. 49; 54 Pa. St. 182; see also Sutherland, pp. 312, 313, 314, 315).

It is well said that the certainty of the law is next in importance to its justice, and if the legislature has expressed its intention in the law itself with certainty, it is not admissible to depart from that intention on any extraneous considerations or theory of construction. Very strong expressions have been used by the courts to emphasize the principle that they are to derive their knowledge of legislative intention from the words or language of the statute itself, which the legislature has used to express it, if a knowledge can be so derived. (See Sutherland Statutory Construction, § 236 and cases cited.)

In *Denn vs. Reid*, 10 Peters U. S., 524, McLean, J., in speaking of construction of statutes, says:

"This, it must be admitted when we consider the mischief the law was probably intended to remedy, is a somewhat technical construction of the act; and cases may be found where courts have construed a statute most liberally to effectuate the remedy, but when the language of the act is explicit, there is great danger in departing from the words used to give effect to the law which may be supposed to have been designed by the legislature."

In 2 Peters 29, Story, J., this language is used:

"What the legislative intention was can be derived only from the words they have used, and we cannot speculate beyond the reasonable import of these words. The spirit of the act must be extracted from the words of the act, and not from conjectures *aliunde*."

This abundant authority cited should certainly be sufficient from which to conclude that it is improper for the court to go beyond what is expressed in the statute, and consider matters *aliunde*, including the alleged fact that the act was hurriedly and improvidently passed. If it were necessary, congress meant to invest the probate courts with jurisdiction, a thing that the legislature had attempted to do but had failed. The statute is clear and expressive in its terms, containing no ambiguity. It states directly, clearly and concisely that the legislative enactments of the territorial legislature are hereby ratified, and there it ends. There is no necessity for the determination of the legislative intent, except to hold that the statute means just what it says, which is plain and unmistakable.

Conceding the premises of the court, however, a little further, the question of public policy presents itself for consideration. The effect of the decision, if it becomes final, will be the annullment of several hundred decrees for divorce,—all those granted since August 14, 1893, by the probate courts.

It would seem fruitless to further discuss these questions, but I feel that my duty under my official oath required that I should, in this connection, under the circumstances surrounding us, in this new country, portray my convictions as they have become established in the past. I feel a certain and abiding faith that this court is committing very grave error, and this without a sufficient and dispassionate consideration of the alarming consequences of its judgment.

All the text writers and all the opinions in reported cases tread lightly when legal controversies of this character are approached—when a mistaken or even well advised determination will result in such widespread and disastrous consequences.

In the case of *Maynard vs. Hill*, 125 U. S., 203, Justice Field makes the following observations:

"Such acts are not to be set aside or treated as invalid because upon careful consideration of their charter doubt may arise as to the competency of the legislature to pass them. Rights acquired or obligations incurred under such legislation are not to be impaired because of subsequent differences of opinion as to the department of government to which the acts are properly assignable. With special force does observation apply, when the validity of acts dissolving the bonds of matrimony is assailed, the legitimacy of many children, the peace of many families, and the settlement of many estates depending upon its being sustained."

In *Starr vs. Pease*, 8 Conn. 941, Doggett, J., observes:

"The power is not limited by the constitution of the United States or by that of the state. In view of the appalling consequences of declaring the general law of the state or the repealed acts of our legislatures unconstitutional and void, consequences easily conceived but not easily expressed, such as bastardising the issue and subjecting the parties to punishment for adultery—the court should come to the result only on a solemn conviction that their oath of office and these constitutions imperatively demand it."

It is true that I have no means of accurately judging the extent of the public distress that will result from the decision in this case, but it is true that numerous divorces have been granted by the various probate courts of this territory since the adoption of the new code, August 14, 1893, and upon the supposed validity of these divorces, marriages have been contracted, children will be born and property-rights

have vested.   This decision will make innocent peo-
ple guilty of adultery and bigamy, will make bastards
of their children  and give  rise to endless  and expen-
sive litigation, both civil and  criminal, for years and
years to come.   Public policy indeed should receive
its share of consideration in this  grave legal contro-
versy.

I now advert to a brief discussion of the power of state
and territorial legislatures to grant what is known as
legislative divorces with the suggestion, first, that I
regard this proposition as infinitely more serious than
the line of reasoning adopted by the court as grounds
for the denial of the jurisdiction of the probate courts.

It is well settled that a state or territorial legisla-
ture may grant a divorce, *a vinculo matrimonii*, unless
expressly forbidden by their Constitution or Organic
Act.   The Organic Acts of all the territories, since the
admission of Wisconsin, contained the provision giv-
ing the territories the power of legislation upon all
rightful subjects of legislation.   The subject of
divorce has always been conceded to be a rightful
subject of legislation both in this country and England,
unless expressly forbidden.   In the case of *Crane vs.
Maginnis*, 1 Gill. & J. 474, the supreme court of Mary-
land says:

"Divorces in this state, from the earliest times, have
emanated from the general assembly, and can now be
viewed in no other light than as regular exertions of
legislative power."

In *Starr vs. Pease, supra,* the court said:

"The law has remained in substance as it was when
enacted in 1667.   During all this period the legislature
has interfered like the parliament of Great Britain and
passed special acts of divorce *a vinculo matrimonii.*
And almost ever since the Constitution of the United
States went into operation, now forty-two years, and
for thirteen years of the existence of the Constitution
of Connecticut, such acts have been, in multiplied

cases, passed and sanctioned by the constituted authorities of our state.

In *Maynard vs. Hill*, Field, Justice, *supra*, on this branch of the question, says:

"The same doctrine is declared in numerous other cases, and positions similar to those taken against the validity of the act of the legislative assembly of the territory, that it was beyond the competency of the legislature to dissolve the bonds of matrimony, have been held untenable. These decisions justify the conclusion that the division of the government into three departments, and the implied inhibition through that cause upon the legislative department to exercise judicial functions, was neither intended nor understood to exclude legislative control over the marriage relation. In most of the states the same legislative practice on the subject has prevailed since the adoption of their constitutions as before, which, as Mr. Bishop observes, may be regarded as a contemporaneous construction that the power thus exercised for many years was rightly exercised. The adoption, of late years, in many constitutions of provisions prohibiting legislative divorces, would also indicate a general conviction that without this prohibition such divorces might be granted, notwithstanding the separation of the powers of government into departments by which judicial functions are excluded from the legislative department. There are, it is true, decisions of state courts of high character, like the supreme courts of Massachusetts and of Missouri, holding differently; some of which were controlled by the peculiar language of their state constitutions. ( *Sparhawk vs. Sparhawk*, 116 Mass. 315; *State vs. Fry*, 4 Mo. 120, 138.) The weight of authority, however, is decidedly in favor of the position that, in the absence of direct prohibition, the power over divorces remains with the legislature. We are, therefore, justified in holding— more, we are compelled to hold—that the granting of divorces was a rightful subject of legislation according to the prevailing judicial opinion of the country, and the understanding of the profession at the time the Organic Act of Oregon was passed by congress, when either of the parties divorced was at

the time a resident within the territorial jurisdiction of the legislature."

The inherent power of a territorial legislature to grant divorces is clearly sustained by the United States supreme court in this case.

The court then discusses the contract relation of marriage and divorce, holding it not to be a contract within the meaning of the federal constitution, and that the legislature was not, by granting divorces, impairing the obligations of a contract.

It being conceded, then, by all the authorities, that marriage and divorce is a rightful subject of legislation when not expressly prohibited by some competent authority, has the legislature the right to delegate or confer this jurisdiction upon such courts as it sees fit within its legislative domain? The Organic Act of this territory provides that the legislature may legislate upon "all rightful subjects of legislation not inconsistent with the constitution and laws of the United States." And, further, that the "supreme and district courts shall possess chancery as well as common law jurisdiction and authority for redress of all wrongs committed against the constitution or laws of the United States or of the territory affecting persons or property," and that "the jurisdiction of the several courts herein provided for, both appellate and original, and that of the probate courts and of justices of the peace, shall be as limited by law." Where, then, from these provisions, does jurisdiction in divorce matters abide? It is well settled by all the authorities that divorce jurisdiction is *sui generis*, not a matter of either common law or chancery jurisdiction, and, being neither a subject of chancery nor common law jurisdiction, the Organic Act of this territory has conferred upon no court any jurisdiction in actions for divorce unless the words, "and authority for redress of all wrongs, committed against the constitution or

laws of the United States affecting persons or property," confers such power upon the supreme and district courts. Then, if no authority has been granted by the Organic Act to any court, and the subject of divorce is a rightful subject of legislation, would not the legislature of this territory have power to delegate its inherent right of granting divorces to any court in its wisdom it desired. Under this view, an act of congress ratifying the act of a territorial legislature, would be unnecessary, and, if this be true, would the fact that congress had ratified it place it beyond the power of the legislature to repeal it in the face of the Organic Act, conferring upon the legislature power over all rightful subjects of legislation. Would congress by so ratifying the act intend to circumscribe the legislature in respect from further granting or taking away this branch of the jurisdiction of such courts.

In *Perris vs. Higley*, 20 Wall, 375, Miller J., the court observes:

"We may, I think, assume, without much hazard, that defining the jurisdiction of the probate court, or indeed, of any court, may be fairly included within the general meaning of the phrase, 'rightful subject of legislation.' Nor do we think there is anything in such legislation inconsistent with the constitution of the United States. There remains, then, only the further inquiry, whether it is inconsistent with any part of the Organic Act itself. * * *

"The common law and chancery jurisdictions here conferred on the district and supreme courts is a jurisdiction very ample and very well understood. It includes almost every matter, whether of civil or criminal cognizance which can be litigated in a court of justice. The jurisdiction of the justices of the peace is specifically limited as regards the moneyed value on which it may decide and by the exclusion of matters concerning real estate. Of the probate court it is only said that a part of the judicial power of the territory shall be vested in them. What part? The answer to this must

be sought in the general nature and jurisdiction of such court as they are known in the history of the English law and in the jurisprudence of this country. It is a tempting subject to trace the history of the probate of wills and the administration of the personal estates of descendants, from the time it was held to be a matter of exclusive ecclesiastical prerogative, down to the present. It is sufficient to say that through it all, to the present hour, it has been the almost uniform rule among the people who make the common law of England the basis of their judicial system, to have a distinct tribunal for the establishment of wills and the administration of estates of men dying either with or without will. These tribunals have been variously called prerogative courts, probate courts, surrogates, orphans' courts, etc. To the functions more directly appertaining to wills and the administration of estates have occasionally been added the guardianship of infants and control of their property, the allotment of dower, and perhaps other powers related more or less to the same general subject. Such courts are not in their mode of proceeding governed by the rules of the common law. They are without juries and have no special system of pleading. They may or may not have clerks, sheriffs or other analagous officers. They were not, in England, considered originally as courts of record; and have never, either in that country or this, been made courts of general jurisdiction unless the attempt to do so in this case be successful."

"It is supposed that a sufficient answer to this course of reasoning is found in the declaration of the 9th section of the Organic Act already cited, that the jurisdiction of the several courts therein provided for, 'shall be as limited by law.' The argument is that this refers to laws to be thereafter made by the territorial legislatures, and that as the power of that body extended to all rightful subjects of legislation, it extended to this of totally changing the jurisdiction of these courts. We are not prepared to say that in deciding what law is meant in this phrase, 'as limited by law', we are wholly to exclude laws made by the legislature of the territory.    *    *    *

"But we hold that the acts of the legislature are

not the only law to which we must look for the powers of these territorial courts. The general history of our jurisprudence, and the Organic Act itself, are also to be considered, and any act of the territorial legislature inconsistent with the latter must be held void."

The final decision of the court in this case was that the Organic Act did not mean to confer any right of chancery or common law jurisdiction upon the probate courts, and that the territorial legislature exceeded its powers in conferring such authority.

This case does not decide that the territorial legislature of Utah had no power to confer divorce jurisdiction upon the probate courts. As stated in the beginning, no court can exercise jurisdiction in divorce matters in the absence of statutory provisions, but how far a territorial legislature may give power to courts in these matters has never been so strenuously denied as to render it a subject of much judicial investigation. The supreme court of Utah seems to be the only court that has passed directly upon this question. It was first decided in *Kenyon vs. Kenyon*, that the legislature had the authority to confer upon the probate courts the power to try and determine divorce cases, but in *Cast vs. Cast*, 1 Utah 112, the case of *Kenyon vs. Kenyon* was overruled. In the case of *Whitmore vs. Hardin* the question was again before the Utah court, and the case of *Kenyon vs. Kenyon* was sustained, and that of *Cast vs. Cast* overruled. Before this last case was decided, congress settled the question in that territory by the act of June 23, 1874, defining the jurisdiction of the territorial courts, and by such act granting power to the probate courts to hear and determine divorce matters.

Thus, as stated, I regard this question as the most serious of the two, and, in my judgment, if the probate courts of this territory have no jurisdiction in

these matters, they have lost it by reason of the fact that divorce is a rightful subject of legislation, and that congress did not intend, by ratifying that which needed no ratification, to take from the legislature this as a rightful subject of legislation conferred by the Organic Act.

As stated in the outset, these questions are not properly before us and I have only discussed the principles involved in a general way. When a case is represented embracing these questions, clearly defined views can be given in detail as to the jurisdictional bounds of the probate courts of this territory, but in the meantime the advancement of far-reaching, perilous and abstract conclusions on questions not *coram nobis* is a dangerous precedent for this court to establish.

I yet have faith that the court will reconsider its determination in this case, and have thus lengthened my general views for such benefit as the court may be able to derive therefrom, knowing that the great volume of business on hand renders the full and complete *investigation of profound and intricate legal* questions requiring deep research and consideration almost impossible, and at the same time respectfully performing my duty as a member of this court under my official oath, to dissent from judgments and conclusions to which I cannot agree.